Neil CURRAN, Plaintiff,

v.

**ABBOTT LABORATORIES
EXTENDED DISABILITY
PLAN, Defendant.**

No. 8:03–CV–158–T–27TBM.

United States District Court,
M.D. Florida,
Tampa Division.

July 9, 2004.

Edward R. Gay, Edward R. Gay, P.A., Orlando, FL, for Plaintiff.

Alan Harrison Brents, Ralph C. Losey, Akerman Senterfitt, Orlando, FL, for Defendant.

### ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

WHITTEMORE, District Judge.

**BEFORE THE COURT** is Defendant's Motion for Summary Judgment (Dkt.25). Upon consideration, Defendant's motion is granted.

Plaintiff sued Defendant Abbott Laboratories Extended Disability Plan ("Plan") contending that he was wrongfully denied long term disability benefits under the terms of his employee welfare benefits plan offered by Abbott to its employees.[1] (Dkt.1, Compl.). The Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* (Dkt.1). Abbott contends that Plaintiff is not totally disabled under the Plan, that the Plan gives it discretion to make final coverage decisions, and that its decision to deny Plaintiff's claim was not wrong from either an 'arbitrary and capricious' or 'heightened arbitrary and capricious' standard of review. (Dkts.25, 26).

Beginning in April 1977, Plaintiff was employed by Abbott as a field service representative. (Dkt.1). He was responsible for providing technical support, including emergency repair, servicing of lab equipment, and performing installation of and maintenance on equipment, which required lifting and relocating equipment. (Dkt. 27, ¶ 5, Ex. A (hereinafter "Claim File A") at 35, 39–42, 94–99).[2] In January 1999, Plaintiff injured his back while attempting to

---

1. Kemper National Services, Inc., the claims administrator, was initially named as a Defendant, but was later dismissed from this action upon the parties' Joint Stipulation for Dismissal of Kemper National Services, Inc. as a Party. *See* (Dkts.20, 21).

2. The job description for a field service representative position is:

 *Degree of Physical Effort and Environment*:
 1. Requires lifting and transportation of laptop computer; cellular modem; service tools; test equipment; and service part kits, as required.
 2. Requires some lifting and relocation of Abbott instrumentation during installations and/or routine service calls.
 3. Duties will normally be performed on-site in customer facility (typically hospital/laboratory environment).
 4. This is a field position which requires substantial travel, including air travel and driving (company vehicle provided).
 (Claim File at 41).

remove a power supply from his company car. (Claim File A at 35). He last reported to work on July 26, 1999 and filed his Employee Extended Disability Plan Benefit Application on November 10, 1999. (Claim File A at 35, 37).[3]

In accordance with the Plan, Plaintiff received disability benefits under the "own occupation" provision from November 27, 1999 until June 30, 2002. (Claim File A at 64, 65, 380–82). Kemper denied Plaintiff's request for long term disability benefits under the "any occupation" provision of the Plan. (Claim File A at 380–82). Plaintiff appealed Kemper's decision, submitting the deposition of his treating physician, Ashraf Hanna, M.D., in support. (Claim File A at 384, 404–67). The appeal was denied and Plaintiff filed the instant action. (Claim File A at 499–501; Dkt. 1).[4]

The evidence in the record includes medical records from Plaintiff's treating physicians, Gary G. Moskovitz, M.D. and Ashraf Hanna, M.D., a functional capacity evaluation performed by physical therapist J. Paul Melton, a Transferrable Skills Analysis and two medical file reviews conducted by board certified orthopaedic surgeons. (Claim File A).

Dr. Hanna, a board certified pain management physician, began treating Plaintiff in April 1999. (Claim File B at 77–78). According to Dr. Hanna, Plaintiff reached maximum medical improvement ("MMI") in October 1999 with a 6% impairment rating. *Id.* at 5. When Plaintiff's pain worsened, Dr. Hanna placed Plaintiff on temporary total disability status on August 6, 2002. (Dkt. 31, Plaintiff's Affidavit, Ex. D).[5] Eventually, he opined that Plaintiff

**3.** The Abbott Extended Disability Plan provides:

> 4.1 Payment of Benefits. In order to receive benefits under the plan, the Board of Review must receive due proof that the employee, while participating under the plan, has become totally disabled, as described below, because of sickness or an accidental bodily injury. . . .
>
> (a) If sickness or accidental bodily injury, directly or independently of all other causes, disables an employee so that he is completely prevented from performing all the duties of his occupation or employment and if the disability continues for a period of 26 weeks, monthly benefits, in an amount determined in accordance with subsection 4.3 below, will be provided. Said disability shall be deemed to have continued for such 26 week period in the event such employee is disabled as described in this paragraph from the same cause during any 26 weeks within the 52 consecutive week period immediately following the first day of such disability or any anniversary thereof. Such benefits will be payable for the period during which such disability continues following such 26 week period, but for no longer than 24 months.
> *[Referred to as "own occupation"].*
>
> (b) If an employee is so disabled that he is completely prevented from engaging in any occupation or employment for which he is qualified, or may reasonably become qualified, based on his training, education or experience, and if benefits have been payable for 24 months, benefit payments will continue during the period he remains so disabled.
> *[Referred to as "any occupation"].*

(Dkt. 25, Ex. B Affidavit of Abbott Laboratories in Support of its Motion for Summary Judgment, ¶ 3, Ex A).

**4.** This case was stayed to permit him to pursue a final administrative appeal with Abbott. (Dkts.7, 8). Abbott reviewed Plaintiff's claim for disability benefits under the "any occupation" provision of the Plan and denied the claim on August 7, 2003. (Dkt. 27, Kemper National Services' Affidavit in Support of Defendant's Motion for Summary Judgment, ¶ 8 (hereinafter "Claim File B") at 806).

**5.** According to Dr. Hanna, Plaintiff would remain on temporary total disability status until a selective block, S1 nerve root block epidural steroid injection was administered to Plaintiff. (Claim File B at 519–23, 529–30). After the injection, Plaintiff would need to decide whether to undergo surgery with Dr. Moskovitz, an orthopaedic surgeon. *Id.* at 523. If Plaintiff declined surgery, he would be placed at MMI again. *Id.*

was no longer at MMI as of September 2002.[6] (Claim File B at 513, 518–519). He subsequently noted that Plaintiff's work restrictions would be "as per the functional capacity examination which is light duty and with the work restrictions as per the functional capacity evaluation. The patient, at this time, continues to be partially disabled, and his work restrictions again are according to the functional capacity evaluation." Id." [7]

Plaintiff obtained a second opinion from Dr. Moskovitz on April 4, 2001.[8] Dr. Moskovitz recommended that Plaintiff "be returned to an occupation where there are less lifting demands than he had at his previous occupation" and stated "[his] formal recommendation is vocational rehab." [9] (Claim File A at 134). He saw Plaintiff in May 2001 and again on May 7, 2003. After reviewing an April 2003 MRI, Dr. Moskovitz stated that "I have recommended before, and still recommend, vocational rehab school." (Claim File B at 19).

J. Paul Melton, a physical therapist, conducted a functional capacity evaluation ("FCE") of Plaintiff on April 25, 2002. (Claim File A at 281–318). The FCE indicated that Plaintiff "can return to a LIGHT Physical Demand Level." He would work best carrying or lifting up to 20 lb at waist high levels. Sitting, standing or walking should be alternated as tolerated.[10] Id. at 282.

6. Dr. Hanna considered a July 2000 MRI. Dr. Hanna testified at his deposition that "I did M.M.I. him before. He starts getting all these pains down the legs and having the M.R.I. findings [taken in July 2000] with herniated disc and all of that, so I do not believe at this point, he is at M.M.I." (Dkt. 29, Deposition of Dr. Ashraf Hanna (hereinafter "Hanna Depo.") at 6); (Claim File B at 513, 519).

7. On September 10, 2002, Dr. Hanna made a corrections in the work status reports he had issued to Plaintiff which placed Plaintiff at temporary total disability. (Claim File B at 166). Dr. Hanna explained: "The temporary disability was for 1–2 weeks after the injections and his work restrictions will be as per the functional capacity evaluation…" In his September 16, 2002 deposition, Dr. Hanna agreed that Plaintiff could not lift more than 20 pounds and could only bend, squat or climb occasionally. (Dkt. 29 at 7). He indicated that he would defer to Dr. Moskovitz concerning any restrictions or work status for Plaintiff after the last injection was administered. (Hanna Depo. at 16). Plaintiff received the injection in January 2003 and Dr. Hanna subsequently placed him on a temporary total disability "until surgery" in February 2003. (Claim File B at 371, 668). Dr. Hanna's February 2003 work status report states that Plaintiff's restrictions are "Per FCE." (Claim File B at 668).

8. Dr. Moskovitz reviewed MRI scans of the lumbar spine from 1999 and 2000, examined Plaintiff and diagnosed a "chronic central to (L) sided L5–S1 disc herniation with underlying L5–S1 degenerative disc disease." (Claim File A at 133–135). In May 2001, Dr. Moskovitz recommended that Plaintiff avoid lifting more than 20 pounds, occasional lifting of 10 to 20 pounds, occasional bending, squatting, crawling, climbing, and that he frequently avoid reaching above shoulder level. (Claim File B at 356). He evaluated Plaintiff again on May 7, 2003 and reviewed an April 28, 2003 MRI (Claim File B at 19). The MRI showed improvement in Plaintiff's "(L) L5–S1 disc herniation" but a development of "moderate severity L4–5 spinal stenosis due to combination of facet joint hypertrophy and ligamentum flavum thickening." (Claim File B at 19).

9. A second opinion was obtained from Dr. Moskovitz on April 3, 2003. (Claim File B at 21–22). He recommended that Plaintiff undergo another MRI of the lumbar spine to determine the current status of the disc herniation. Id.

10. More specifically, the results of the FCE indicated:

Reliability and Consistency of Effort
The results of this evaluation suggest that Mr. Curran gave a reliable effort …. Overall data and clinical observations suggest that demonstrated efforts were maximal. No consistent overt evidence of symptom magnification behavior was seen.
Functional Abilities
Client demonstrated ability to perform the following Lifting activities at the Light level:

Jill Klein Radke, a vocational expert, conducted a transferable skills analysis to determine whether jobs existed which would meet the limitations imposed by the functional capacity evaluation. (Claim File A at 369–373) [11] The results of her analysis indicated that Plaintiff was able to perform other occupations based on his vocational background. *Id.* at 373.

Plaintiff's file was reviewed by James Wallquist, M.D., a board certified orthopedic surgeon on October 30, 2002. (Claim File A at 399). He reviewed Plaintiff's medical records and the results of the FCE and transferrable skills analysis and concluded that "there are insufficient updated quantitative objective physical findings and diagnostics to support a functional impairment that would preclude this claimant from performing in any occupation beginning 7/1/02." *Id.* at 401. He stated in his report, however, that additional information that would be helpful in reconsideration of Plaintiff's case would include updated quantitative objective physical findings from Dr. Hanna or Dr. Moskovitz and an IME. *Id.*

Another medical file review was performed by Leela Rangaswamy, M.D., a board certified orthopaedic surgeon in June 2003. (Claim File B at 798–800). She also concluded that Plaintiff was "not completely prevented from engaging in any occupation or employment for which

he is qualified based on his training, education or experience." *Id.* at 798.

## Applicable Standards

### A. Summary Judgment Standard

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56. The Court must view all evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1285 (11th Cir.1997). Judgment in favor of a party is proper where there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party on the issue before the Court. Fed. R.Civ.P. 56.

### B. Standard of Review

■ ERISA does not provide a standard of review of decisions by a plan administrator or fiduciary in actions challenging benefit determinations under § 1132(a)(1)(B). *Firestone Tire and Rub-*

---

High Lift, Mid Lift, Low Lift, and Full Lift. Client is able to perform the following activities on a Constant basis: Carry up to 20 Lb; on a frequent basis: Walk, Reach with Weight; Handling, Bi–Manual Handling, Fingering, Bi–Manual Fingering, Tool Use; on an Occasional basis: Push Cart—40 lb, Pull Cart—40 Lb, Balance, Crawl, Stoop, Kneel, Climb Stairs, Reach Immediate (L), Reach Immediate (R), Reach Overhead (L), Reach Overhead (R), Feeling, Eye–Hand–Foot, transition between Stand/ Sit, Sitting, Standing. Restrictions and Modifications Client did not demonstrate ability to perform the following activities: Carry—50 Lb,

Crouch. He demonstrates evidence of deconditioning.
(Claim File A at 282).

11. Radke interviewed Plaintiff to determine his background, education and interests and considered the FCE results in attempting to ascertain positions involving a light level of exertion. *Id.* at 370. A computerized assessment tool was used to identify appropriate positions for Plaintiff, which included test fixture designer, surgical forceps fabricator, layout technician and finishing inspector. *Id.* at 372.

ber Co. v. Bruch, 489 U.S. 101, 108–09, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Paramore v. Delta Air Lines,* 129 F.3d 1446, 1449 (11th Cir.1997). The Supreme Court has established that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Bruch,* 489 U.S. at 115, 109 S.Ct. 948. Consistent with the Court's directive in *Bruch,* the Eleventh Circuit has adopted three standards of review for plan interpretations: de novo, applicable where the plan administrator is not afforded discretion; arbitrary and capricious when the plan grants the administrator discretion; and heightened arbitrary and capricious when there is a conflict of interest. *Buckley v. Metropolitan Life,* 115 F.3d 936, 939 (11th Cir.1997) (*citing Marecek v. BellSouth Telecommunications, Inc.,* 49 F.3d 702, 705 (11th Cir.1995)).

▌ The Eleventh Circuit interprets *Bruch* to "mandate de novo review unless the plan expressly provides the administrator discretionary authority to make eligibility determinations or to construe the plan's terms." *Kirwan v. Marriott Corp.,* 10 F.3d 784, 788 (11th Cir.1994). The grant of discretion must be by "express language unambiguous in its design'" in order to trigger arbitrary and capricious standard of review. *Hunt v. Hawthorne Assocs. Inc.,* 119 F.3d 888, 912 (11th Cir. 1997). (citation omitted); *Moon v. American Home Assurance Co.,* 888 F.2d 86, 88 (11th Cir.1989).

▌ To determine the appropriate standard of review, "*all* of the plan documents" are examined. *Shaw v. Connecticut General Life Ins. Co.,* 353 F.3d 1276, 1282 (11th Cir.2003) (quoting *Cagle v. Bruner,* 112 F.3d 1510, 1517 (11th Cir. 1997)). Notwithstanding Plaintiff's con-

tentions to the contrary, an express grant of discretion may be included in a summary plan description so long as the modification in the summary plan description is not invalid, considering the requirements of ERISA and the Plan. *Shaw,* 353 F.3d at 1282–83 (citing *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995); 29 U.S.C. §§ 1102(b)(3), 1022(a), and § 1024(b); 29 C.F.R. § 2520.104b–3). Nothing in the holding of *Shaw* prevents a grant of discretion from being made in a summary plan description.

Here, the Summary Plan Description ("SPD") provides:

The plan administrator has full discretion and authority to make the final decision regarding all areas of plan interpretation and administration, including eligibility for benefits, level of benefits provided, interpretation of plan language (including this summary plan description) or administrative procedures.

The decision of the plan administrator is final and binding on all individuals dealing with or claiming benefits under the plan, and, if challenged in court, the plan intends for the plan administrator's decision to be upheld, unless found by a court of competent authority to be arbitrary and capricious.

(Dkt. 25, Ex. B, Affidavit of Abbott Laboratories in Support of its Motion for Summary Judgment, ¶ 5, Ex. B, Summary Plan Description (hereinafter "SPD") at 178).

▌ This language unambiguously and expressly affords the plan administrator full discretion to make all final decisions with respect to interpretation and coverage under the term of the Plan. *See Shaw,* 353 F.3d at 1282–83. Additionally, the SPD is valid, considering the requirements of ERISA, as it includes a standard clause reserving to Abbott's Board of Directors

and the Board of Review the right to make amendments and establishing a procedure for amendments. *See* (Plan at 14–15); *see also Curtis–Wright Corp.*, 514 U.S. at 79–81, 115 S.Ct. 1223. Accordingly, the discretion provided in the SPD warrants application of a deferential standard.

**█]** Under both the 'arbitrary and capricious' and 'heightened arbitrary and capricious' standards, "it is fundamental that the fiduciary's interpretation first must be 'wrong' from the perspective of de novo review before a reviewing court is concerned with the self-interest of the fiduciary." *Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1566 n. 12 (11th Cir.1990). A decision is wrong if, after reviewing the plan documents and disputed terms de novo, the court disagrees with the administrator's plan interpretation. *HCA Health Services of Georgia, Inc. v. Employers Health Insurance Co.*, 240 F.3d 982 (11th Cir.2001). "Only when the court disagrees with the decision does it look for a conflict and, when it finds such a conflict, it reconsiders the decision in light of this conflict." *HCA Health Services*, 240 F.3d at 993–94 (explaining *Marecek v. BellSouth Telecommunications, Inc.*, 49 F.3d 702, 705 (11th Cir. 1995))..

**█** The overwhelming evidence in this record supports a finding that Defendant's decision to deny Plaintiff long term disability benefits was not wrong. Dr. Moskovitz, Plaintiff's own second opinion doctor, opined that Plaintiff had physical limitations but could return to an occupation that had light level physical demands. Dr. Moskovitz repeatedly emphasized that Plaintiff should attend vocational rehabilitation school and return to an occupation with less lifting demands than Plaintiff's previous position. Additionally, the func-

tional capacity evaluation indicated that Plaintiff could perform some limited physical activity and could return to an occupation with a light physical demand level. Finally, Dr. Hanna, Plaintiff's treating physician, agreed that Plaintiff's work restrictions were "as per the functional capacity evaluation." In sum, all of the physician evaluations as well as the objective testing support Abbott's determination that Plaintiff was not so disabled that he was prevented from engaging in any occupation.

Accordingly, there is no basis in this record from which to find that Plaintiff is "so disabled that he is completely prevented from engaging in any occupation or employment for which he is qualified, or may reasonably become qualified, based on his training, education or experience." [12] (Dkt.25, Ex. B, ¶ 3, Ex. A). That Dr. Hanna placed Plaintiff on a temporary total disability status is not inconsistent with Defendant's analysis and rationale for denying Plaintiff long term disability benefits. Dr. Hanna's placement was only temporary and he deferred to the findings of the functional capacity evaluation with respect to any work restrictions. The FCE indicated that although Plaintiff had permanent limitations, he could perform light duty work. Finally, two board certified orthopaedic physicians independently reviewed Plaintiff's medical records and reached the conclusion that there was insufficient evidence to support a finding that Plaintiff is completely prevented from engaging in any occupation.

Given this record, Defendant's decision denying Plaintiff's application for long term disability benefits was not wrong. Accordingly, there is no basis to consider whether a conflict of interest existed.

---

12. This conclusion is based on the medical information and evidence that existed prior to Defendant's final decision upholding termination of Plaintiff's benefits. *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1139 (11th Cir.1989).

*HCA Health Services,* 240 F.3d at 993–94 (explaining *Marecek v. BellSouth Telecommunications, Inc.,* 49 F.3d 702, 705 (11th Cir.1995)). It is, therefore,

**ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment (Dkt.25) is **GRANTED.** Judgment is entered in favor of Defendant Abbott Laboratories Extended Disability Plan. The Clerk is directed to deny all pending motions as moot and close this case.